**FEDERAL DEPOSIT INSURANCE CORPORATION**

v.

**EAGLE PROPERTIES, LTD., Thomas C. Brown, M.W. Branum, J.L. Davis, Charles R. Perry, Gene Sledge, Clint Hurt and Charles Lawrence.**

No. MO–84–CA–35.

United States District Court,
W.D. Texas,
Midland-Odessa Division.

Sept. 25, 1985.

John Gilliam, Lewis LeClair, Thomas Albright, Jenkins & Gilchrist, Dallas, Tex., for plaintiff.

Seagal Wheatley and Leo Bacher, San Antonio, Tex., Carl D. Adams, Dallas, Tex., Jimmie B. Todd, Odessa, Tex., Jim Choate and Dewey R. Hicks, Jr., Dallas, Tex., Jim Allsup and M.W. Branum, Midland, Tex., for defendant.

## OPINION

BUNTON, District Judge.

### I.

#### A.

Every trial is a mosaic of circumstances, personalities, and occurrences. Each case is a recreation by use of recollections and documents of the interplay of how personalities conducted themselves to a set of circumstances. From that, our system of justice requires a factfinder to make factual determinations concerning the propriety of the personalities' conduct. That conduct is gauged by our society's notions and policies of right and wrong.

This case is a suit by a federal corporation on an indebtedness in the amount of $25 million evidenced by promissory notes executed by the Defendants. To understand why these Defendants allegedly undertook such a substantial obligation and why they had chosen to come into this forum to contest the right of the Plaintiff to that sum, one must briefly digress to examine the person of Charles Fraser, the President and Chief Executive Officer of the First National Bank of Midland during most of the time relevant to this case, and to examine the institution itself and the image it earned and sought so desperately to preserve.

Charles Fraser was elevated to the position of president and chief executive officer during a gilded era in the history of the Permian Basin of West Texas. He had come to the First National Bank as a petroleum engineer in the 1960's and worked his way to the presidency of the bank. He was, from various accounts, a knowledgeable, shrewd, assertive individual. He was in one sense demanding and dominating. In another sense, he suffered under the disability of taking too much upon himself. Nevertheless, his friendship or association was sought by businessmen and civic leaders in the Permian Basin.

The First National Bank was a monument in the Permian Basin. It was a large, independently-owned bank. It had weathered in years past the frailties of the Permian Basin economy. Sturdy and strong, the First National Bank was paid perhaps the highest compliment that can be bestowed upon an institution. It was said to be stronger than an acre of garlic.

So, as the decades of the 1970's closed, Charles Fraser headed this bank during a time when the area was experiencing in actuality a boom on top of a boom which had begun in the mid–1970's. However, by 1982, the boom had bottomed, and the bank, which had grown so large, experienced unsettling troubles with its liquidity posture. The sources of these troubles included: an inordinate concentration of loans in the energy and associated indus-

tries area; less than careful lending practices; and imprudent growth.

Before the bust, Fraser presided over a bank in an area where even the less efficient and less sophisticated could make money. Times had changed. By 1982, the fate staring the bank president was obviously unbecoming. He, therefore, took steps that he hoped would enable the bank to survive a drain on its deposits until a rebound in the oil and gas industry occurred or the inner dynamics of the bank took over.

The Court, in considering this background, is reminded of the circumstances and the fate of the captain of the transatlantic liner *Titanic*. The analogies are poignant.

The First National Bank, like the vessel, was a magnificent, extravagant, enviable camelot. It was regarded as unsinkable, said to be designed and engineered to withstand the formidable forces of natural laws. The bank, like the liner, was doubly-supported, tightly-compartmental. If one of its parts were weakened or damaged, the other sections were designed to keep it afloat.

Each of these monuments attracted the names familiar to business and society pages. Each was revered by those in certain circles.

Each was led by an individual who was said by all as born to command—a captain who had risen through the ranks and left aside other individuals of lesser capabilities and greater disabilities. Each captain was aided by capable, attractive and knowledgeable officers and engineers. Each was asked to take his monument through a routine and pleasant passage. But, as did the captain of the ship, so did the chief of the bank, fail to heed the hints of conditions in the West that suggested the course might be other than propitious. Each, although having received warnings, decided to follow the prevailing practice of relying on a sharp lookout rather than reducing the speed of his camelot. So, each officer saw an unyielding force and ordered a turn of direction. But, the sheer size of what each commanded and the momentum that

was carried meant a lapse of time before a turn could be manipulated. Each monument encountered damage and began to lose its buoyancy. The advisors for each group were called and said the unsinkable ship was badly damaged but that her other sections would hold her up. Such was not the case.

Each called to the others in his given profession for help. The calls were answered, but too late. So, each commander's monument sank in the morning hours to the depths of ignominy to the brutal shock of their respective communities.

### B.

The Plaintiff, FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC), brings this action to collect $25 million in notes given by the individual Defendants to EAGLE PROPERTIES, LTD., a Texas limited partnership, and thereafter assigned to the First National Bank of Midland as part of the $75 million stated consideration for the sale and leaseback of the bank's 24-story office building, ten-story parking garage, and drive-in motor facility. The sale leaseback was consummated on December 31, 1982. The remaining $50 million of the purchase price came from two unfunded letters of credit in the amount each of $25 million from InterFirst Bank in Dallas, Texas and Texas Commerce Bank in Houston, Texas. The FDIC acquired the notes upon the closing of the First National Bank on October 14, 1983. In January 1984, the FDIC made a formal demand for the payment of interest purportedly due on the notes. The Defendants refused to make the demanded payment. Acting pursuant to the terms of the notes, the FDIC gave the Defendants notice of acceleration and, on February 22, 1984, instituted this action to collect on the notes by filing a complaint with this Court.

The Defendants, as best the Court ascertains from their pleadings, contend, among other things, that the notes executed by the Defendants are not negotiable instruments under the Uniform Commercial Code. As such, the Defendants also contend that the FDIC is not a holder in due

course and is subject to all the personal defenses available to the Defendants. The Defendants further contend that the notes are neither due nor payable under the terms of a subordination agreement. In addition, the Defendants contend that they were fraudulently induced into entering into the sale-leaseback transaction by the alleged misrepresentations of Charles Fraser, then the president of the bank, as to the value of the building and the financial condition of the bank. The Defendants finally contend that they were defrauded into approving the early funding of the two letters of credit.

Trial of this cause was had without a jury.[1] Trial commenced on February 26, 1985, and continued through February 28, 1985, when the Court recessed. Trial resumed on March 6, 1985, and was completed the following day. Upon completion of the trial, the Court permitted each side to submit post-trial briefs.

The Court has reviewed, weighed, and considered the evidence presented at trial. In addition, the Court has considered the positions of the parties as set forth in their ably-done briefs and memoranda. The Court enters this opinion, which will stand and constitute the Court's Findings of Fact and Conclusions of Law as prescribed by Fed.R.Civ.P. 52(a).

## II.

EAGLE PROPERTIES, LTD., a limited partnership, was formed under the laws of the State of Texas pursuant to Articles of Limited Partnership executed on December 30, 1982. The Certificate of Limited Partnership for EAGLE PROPERTIES was filed with the Secretary of State of Texas on December 31, 1982. THOMAS C. BROWN and M.W. BRANUM are the general partners of the limited partnership.

The limited partners of EAGLE PROPERTIES are J.L. DAVIS, CHARLES R. PERRY, GENE SLEDGE, CLINT HURT, and CARL LAWRENCE.

On December 31, 1982, EAGLE PROPERTIES and the First National Bank entered into an extraordinary sale-leaseback transaction involving numerous documents. Extraordinary not in the sense that it was totally a paper transaction, but in the sense that the vendor went to great lengths to minimize the risks inherent to the vendee in such a transaction. Among the documents was an Agreement of Sale and Purchase of Real Property. Under the agreement, EAGLE PROPERTIES purchased from the First National Bank, the 24-story office building (at that time the tallest building in the city), ten-story parking garage, and drive-in banking facilities, as well as the property on which these structures were located.

The total purchase price was $75 million, subject to an adjustment as provided in the agreement. This was paid first, by the assignment of, with recourse, unsecured three-year promissory notes by the individual partners of EAGLE PROPERTIES in the aggregate principal amount of $25 million bearing interest at the rate of ten percent per annum, and providing payments on December 31 of each year of the term of the notes. Payment of the notes was secured by a vendor's lien and deed of trust lien in favor of the First National Bank and subordinate to all liens securing the obligations to InterFirst Bank in Dallas, Texas and Texas Commerce Bank in Houston, Texas. Secondly, EAGLE PROPERTIES delivered to the First National Bank two irrevocable letters of credit, each in the face amount of $25 million and issued by InterFirst Bank and Texas Commerce Bank. It should be noted that the purchase was subject to an upward adjust-

---

1. The Court has jurisdiction over this cause pursuant to three statutes. 12 U.S.C. § 1819 provides that all suits of a civil nature at common law or in equity to which the Federal Deposit Insurance Corporation is a party are deemed to arise under the laws of the United States, and federal district courts have original jurisdiction over these suits without regard to the amount in controversy. 15 U.S.C. § 78aa and 15 U.S.C. § 77a provide that a federal district court has exclusive jurisdiction over claims involving violations of the rules and regulations promulgated under the Securities Exchange Act of 1934 and the 1933 Securities Act. 12 U.S.C. § 1973 provides that a federal district court has jurisdiction to prevent and restrain violations of 12 U.S.C. § 1972.

ment. The price of $75 million, though, remained as a floor. Paragraph 2.3 of the Agreement of Sale and Purchase of Real Property provides:

*Adjustment in Purchase Price.* Seller and Purchaser agree to secure an appraisal of the property by March 31, 1983, by a nationally recognized real estate appraisal firm acceptable to them, with the cost of such appraisal to be borne by seller. If the appraisal reflects that the value of the property is in excess of Seventy-Five Million and no/100 Dollars ($75,000,000.00), then the sales price of the property shall be increased to an amount equal to the appraisal value and seller shall receive a demand note from purchaser for an amount equal to the difference between Seventy-Five Million and no/100 Dollars ($75,000,000.00) and the appraisal value, which note shall bear interest at the rate of 10% per annum, payable annually. If the appraised value is less than Seventy-Five Million and no/100 Dollars ($75,000,000.00), no adjustment shall be made in the purchase price....

On December 31, 1982, the partners of EAGLE PROPERTIES, either individually or through an attorney-in-fact, executed form promissory notes in the favor of EAGLE PROPERTIES, LTD. THOMAS C. BROWN executed two notes in the amount of $2.5 million and a third note in the amount of $1.25 million. M.W. BRANUM executed two notes in the amount of $2.5 million and $1.25 million. J.L. DAVIS, CHARLES PERRY, GENE SLEDGE, CLINT HURT, and CARL F. LAWRENCE, each, executed a note in the amount of $2.5 million.

Each note contained the following language:

PROMISSORY NOTE

[$ Amount]     Midland, Texas     December 31, 1982

FOR VALUE RECEIVED on the above date, the undersigned (hereinafter called Maker) promises to pay to the order of EAGLE PROPERTIES, LTD., a Texas Limited Partnership, and any subsequent holder hereof (all of which are hereinafter called Lender), at 303 W. Wall, Midland, Texas 79701 or such other place as Lender may hereafter designate in writing, the sum of [amount in letters and figures] with interest from the date of actual disbursement of funds at a rate equal to TEN PERCENT (10%) per annum, computed on a daily basis until paid.

This Note shall be repayable as follows:

(a) December 31, 1983—one (1) payment equal to the amount of interest accrued and unpaid from the date of this note to December 31, 1983;

(b) December 31, 1984—one (1) payment equal to the amount of interest accrued and unpaid from December 31, 1983, to December 31, 1984; and

(c) December 31, 1985—one (1) payment equal to the amount of all unpaid principal and interest.

If, for any reason, this Note is placed in the hands of an attorney for collection, suit is brought, or a claim is filed hereon in a Bankruptcy Court, then Maker agrees to pay to Lender in addition to principal and interest all reasonable attorneys' fees and expenses.

At the option of Lender, all amounts due and unpaid shall be accelerated and shall become immediately due and payable without demand or notice upon the occurrence of any of the following events: default in the payment of any payment as herein agreed; failure of Maker to keep and perform any covenant herein or otherwise made with Lender; any proceedings or arrangements in bankruptcy by or against Maker; Maker becomes insolvent; or any assignments or receiverships, whether in or out of court, of Maker, or any of Maker's property for the benefit of Maker's creditors. In the event of any such acceleration, all other obligations owed by Maker to lender shall, at the option of Lender, also be accelerated and shall become immediately due and payable without demand or notice.

Maker waives presentment for payment, notice of dishonor or nonpayment of any portion hereof, protest, notic eof protest, diligence in collecting this obligation or bringing suit to enforce payment and agrees to any extensions of time of payment and partial payment before, at, or after maturity. Acceptance by Lender of a partial payment shall not waive an existing or future default.

Maker further agrees that in case of renewals or extensions of the maturity of this Note any and all security interests, pledges or mortgages given to secure same shall remain in full force and effect as security for the payment of the renewed or extended obligation.

    (signed by Marker)

Pay to the order of The First National Bank of Midland with recourse.

    EAGLE PROPERTIES, LTD.
    (signed)    (date)
    M.W. BRANUM,
    General Partner
    (signed)    (date)
    THOMAS C. BROWN,
    General Partner

The above signatures by BROWN and BRANUM represent endorsements by EAGLE to the First National Bank on December 31, 1982. These endorsements were executed by BROWN and BRANUM, who had the authority to make such endorsements on behalf of EAGLE. Each note was delivered to the First National Bank on December 31, 1982.

BROWN and BRANUM as general partners of EAGLE PROPERTIES, LTD., on December 31, 1982, assigned the notes in issue to the First National Bank. Each assignment contained the following language:

    EAGLE PROPERTIES, LTD., a Texas limited partnership ("Assignor") is the legal and equitable owner and holder of that one certain Promissory Note (the "Note") in the original principal sum of [$ Amount] dated the 31st day of December, 1982, executed by (Debtor) payable to the order of Assignor, which Note is more fully described as bearing interest at the rate of Ten Percent (10%) payable

in one (1) installment of interest only on December 31, 1983; one (1) installment (of) interest only (on) December 31, 1984; and one (1) installment of unpaid principal and interest on December 31, 1985, and dated December 31, 1982.

On October 14, 1983, the acting Comptroller of the Currency, acting pursuant to 12 U.S.C. § 192, declared the First National Bank insolvent and appointed the FDIC as Receiver of First National Bank. Thereafter, but still on October 14, 1983, the FDIC, in its capacity as receiver, conveyed certain property of the First National Bank, including the notes in issue, to the FDIC, in its corporate capacity under a Contract of Sale and Assignment. In exchange for the Receiver's conveyance of these properties, including the EAGLE notes, the Contract of Sale provided for a purchase price to be paid by the FDIC in its corporate capacity, including the assumption of the bank's indebtedness to the Federal Reserve of $664,000,000.00 and payment by the FDIC to Republic Bank in the amount of $282,708,750.00. This Court approved the Contract of Sale by Order dated October 14, 1983, *In the Matter of the Liquidation of the First National Bank of Midland*, MO–83–CA–174. In that Order, the Court opined that both the Purchase and Assumption Agreement between the FDIC, as receiver, and Republic Bank First National Midland, as the assuming bank, and the Contract of Sale are in the best interest of the public, the stockholders, the depositors, and other creditors of the bank. The Court approved execution of the agreements.

Each of the makers of the notes received written demand from the FDIC for payment of interest claimed by the FDIC to be due under the note he executed. BROWN, BRANUM, and EAGLE PROPERTIES also received a written demand from the FDIC for the payment of interest claimed by the FDIC to be due on all of the notes. During this time period, each of the makers of the notes received written notice from the FDIC of an acceleration of the notes in issue, BROWN, BRANUM, and EAGLE

PROPERTIES received written notice from the FDIC of acceleration of all of the notes.

## A.

Defendants in this case contend that the writing sued upon is not a note within the meaning of the Uniform Commercial Code; but, rather, the writings in issue are contracts for the payment of money, not capable of being conveyed to a holder in due course. A note is a written unconditional promise to pay another a certain sum of money at a certain time, or at a time which must certainly arrive. *Strom v. Dickson*, 360 S.W.2d 823 (Tex.Civ.App.—Waco 1962, no writ); *Southview Corporation v. Kleberg First National Bank*, 512 S.W.2d 817 (Tex.Civ.App.—Corpus Christi 1974, no writ). Every note, negotiable or nonnegotiable, must be a contract before it can qualify as a note. *Kleiner v. First National Bank of Atlanta*, 581 F.Supp. 955, 957 (N.D.Ga.1984).

The writing must contain the essential elements of a contract, namely, an agreement voluntarily entered into between competent parties upon legal consideration on a legal subject matter. *See Echols v. Professional Financial Associates, Inc.*, 607 S.W.2d 292, 294 (Tex.Civ.App.—Texarkana, 1980, writ ref'd n.r.e.). In addition, in order to constitute a note, a contract must be in writing signed by the maker and call for the payment of money at a definite time rather than the delivery of goods or the performance of services. *Strom v. Dickson, supra; Southview Corporation v. Kleberg First National Bank, supra.* The character of such a contract is critical. If such is negotiable, then the instrument is enforceable on its own terms, except against real defenses such as fraud in the factum, incapacity, and forgery. *FDIC v. Wood*, 758 F.2d 156, 160 (6th Cir.1985). Negotiability, therefore, denotes a simplicity of transfer of the instrument, and the ability of a transferee to acquire the instrument for value and in good faith, before it is overdue, to cut off personal defenses and equities which could have been asserted against the transferor.

Defendants' position is that the notes in question are not negotiable. Section 3–104 of the Uniform Commercial Code sets out the requisites for the negotiability of an instrument. *Hinckley v. Eggers*, 587 S.W.2d 448, 450 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.). Section 3.104(a)(1) provides that

(a) Any writing to be a negotiable instrument within this this chapter must

(1) be signed by the maker or drawer, and

(2) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation, or power given by the maker or drawer except as authorized by this chapter; and

(3) be payable on demand or at a definite time; and

(4) be payable to order or to bearer.

Tex.Bus. & Com.Code Ann. § 3.104 (Vernon 1968).

There can be no dispute that requisites 1, 3, and 4 have been met. The notes in issue were signed by their respective makers; they are payable to order and payable at a definite time. Defendants focus, however, upon the second requisite and, in particular, the requirement that the instrument contain "an unconditional promise to pay a sum certain in money." Defendants contend that the language stating "with interest from the date of actual disbursement of funds" does not state a sum certain.

The character of a promise is to be determined by what is expressed in the instrument itself. *Insurance Agency Managers v. Gonzales*, 578 S.W.2d 803 (Tex.Civ.App. 1979); *Hinckley v. Eggers, supra, Loe v. Murphy*, 611 S.W.2d 449 (Tex.Civ.App.—Dallas 1980, writ ref'd. n.r.e.); Uniform Commercial Code Comment to § 3.105, Tex.Bus & Com.Code Ann. (Vernon 1968); *see also First State Bank v. Clark*, 91 N.M. 117, 570 P.2d 1144 (1977). Section 3.106 provides:

(a) The sum payable is a sum certain even though it is to be paid

(1) with stated interest or by stated installments; or

(2) with stated different rates of interest before and after default or a specified date; or

(3) with a stated discount or addition if paid before or after the date fixed for payment; or

(4) with exchange or less exchange, whether at a fixed rate or at the current rate; or

(5) with costs of collection or an attorney's fee or both upon default.

Tex.Bus. & Com.Code Ann. § 3.106 (Vernon 1968).[2]

The Court agrees with the Kansas Supreme Court, in the pre-UCC case of *Citizens State Bank v. Pauly*, 152 Kan. 152, 102 P.2d 966 (1940) where it stated the correct test to be applied in passing on whether an instrument contains an unconditional promise to pay a sum certain. In that case, it was stated:

> The primary test to be applied in determining whether a disputed provision renders the amount that will be due on the note uncertain and therefore destroys negotiability, is whether the provision leaves a possibility of reduction in the amount collectible on the note. Certainty of amount is not affected if the provision gives the maker no opportunity of reducing his note obligation. *Id.* at 969.

In the case *sub judice*, the notes provide that the maker is to pay the payee a principal amount "with interest from the date of actual disbursement of funds at a rate equal to TEN PERCENT (10%) per annum, ..." However, the second paragraph of each note provides that the note is repayable as follows: "(a) December 31, 1983— one (1) payment equal to the amount of interest accrued and unpaid from the date of this note to December 31, 1983; ...." As such, this Court must turn to rules of construction to determine the issue of whether the notes contain an unconditional promise to pay a sum certain.

In *Echols v. Professional Financial Associates, Inc. supra* at 295, the Texarkana Court of Civil Appeals stated:

> The most basic rule of construction is that the intention of the parties as expressed in the instrument should be ascertained and given effect. *Spence & Howe Construction v. Gulf Oil Corp.* 365 S.W.2d 631 (Tex.1963); *Republic National Bank of Dallas v. National Bankers Life Ins. Co.*, 427 S.W.2d 76 (Tex.Civ.App.Dallas 1968, writ ref'd n.r. e.); *Ervay, Inc. v. Wood*, 373 S.W.2d 380 (Tex.Civ.App.Dallas 1963, writ ref'd n.r. e.), In so doing, the Court should not inquire as to what the parties meant to say, but should ascertain the meaning of what they did say. However, the provisions of the contract which are apparently inconsistent or conflicting are to be reconciled and harmonized, if possible, by reasonable interpretation so as to give effect to the contract as a whole and an interpretation should not be given, if possible to one part of the contract which will annul another part of the contract. *Mercer v. Hardy*, 444 S.W.2d 593 (Tex. 1969); *Southland Royalty Company v. Pan American Petroleum Corporation*, 378 S.W.2d 50 (Tex.1964); *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617 (1954); *Young v. De La Garza*, 368 S.W.2d 667 (Tex.Civ.App.Dallas 1963, no writ).

After applying these rules of construction, the Court concludes that what the parties in this case said was that interest is to run from the date of the notes. Therefore, the Court holds that the instruments do satisfy the requirements of containing an unconditional promise to pay a sum certain and are negotiable. The first payment under the note is to be "**the amount of interest accrued and unpaid from the date of this note to December 31, 1983.**" Thus, the date of actual disbursement of funds appears to be the date of the note, which is December 31, 1982. This must be so for the reason that each note recites that it was given "**FOR VALUE RECEIVED**" on December 31, 1982.[3]

---

**2.** Hereinafter all references to the Uniform Commercial Code will be made to that adopted by Texas in the Texas Business and Commerce Code, Annotated.

**3.** The Court finds in this connection that the Defendants treated the transaction as interest having begun to accrue on December 31, 1982.

Tex.Bus. & Com.Code § 3.307(b) provides that when the signatures on an instrument are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense. Section 3.307(c) provides that after it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he is the same person under whom he claims is in all respects a holder in due course. The FDIC produced the notes in issue and the genuineness of the Defendant-Maker's signature is not at issue. Thus, the FDIC should be entitled to recover on the notes unless the Defendants established a defense. If the Defendants established a defense, then the FDIC, in order to prevent the success of such defense or defenses, has the burden of establishing that it is a holder in due course. Tex.Bus. & Com.Code § 3.305 provides that a holder in due course takes the instrument free from "(a) **all claims to it on the part of any person; and (b) all defenses of any party to the instrument with whom the holder has not dealt**" except real defenses, such as infancy, incapacity, or **fraud esse cotractus.**

■ Tex.Bus. & Com.Code § 3.302 defines a holder in due course. A holder in due course is a holder who takes the instrument for value, in good faith, and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. The FDIC in this case is not a holder in due course under the Uniform Commercial Code. Tex.Bus. & Com.Code § 3.302(c) provides that a holder does not attain due course status by taking an instrument under legal process. *Federal Deposit Insurance Corporation v. Vineyard*, 346 F.Supp. 489, 492 (N.D. Tex.1972). However, a due course status can be accorded the FDIC when that federal corporation acquires a note in the execu-

tion of a purchase and assumption transaction. *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.1982), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *Federal Deposit Insurance Corporation v. Gulf Life Insurance Company*, 737 F.2d 1513 (11th Cir.1984).

The leading case is *Gunter v. Hutcheson*. In that case, the plaintiffs took out a loan for $5.5 million with the Hamilton National Bank of Chattanooga to obtain funds to purchase a controlling interest in the Hamilton Bank & Trust Company of Atlanta. The plaintiffs executed two promissory notes for $2.5 and $3.0 million respectively. The Chattanooga bank failed. The lending bank in the instrument also failed. The FDIC in its corporate capacity became the holder of the note in the course of a purchase and assumption transaction with the First Tennessee National Bank. The plaintiffs filed suit against the former directors and officers of the Chattanooga bank, seeking damages and rescission of the notes on the basis of violation of federal and state securities laws and state and common law fraud. The plaintiffs alleged their purchase of the Atlanta bank was induced by the fraudulent misrepresentations made to them by the officers and directors of the lending bank.[4] They also sought rescission of the $3 million note held by the FDIC on the same grounds. The FDIC counterclaimed for payment of the note.

The FDIC moved for summary judgment on the theory that it was protected by the Gunters' claims under either the provisions of 12 U.S.C. § 1823(e) or by federal common law. For purposes of the motion, the FDIC agreed that the Gunters were defrauded into their stock purchase and this fraud would ordinarily be adequate grounds for rescission. The District Court granted the FDIC's motion for summary

---

**4.** The alleged misrepresentations included, among others, (1) that Chattanooga Hamilton would leave $7 million in certificates of deposit in the Atlanta Hamilton for at least one year from the Gunters' acquisition of stock; (2) that Atlanta Hamilton would continue to have a federal funds line of $1 million through the Chattanooga Hamilton; (3) that the Chattanooga Ham-

ilton was in sound financial condition and would be able to offer continued financial support to the Atlanta Hamilton; (4) that Atlanta Hamilton would net $500,000 per year and the Gunters would make enough in stock dividends to pay the interest on their notes; and (5) that the interest on the notes in certain circumstances would be deferred. *Id.* at 866, n. 5.

judgment, holding that, although protections accorded the FDIC in 12 U.S.C. § 1823(e) did not extend to the Gunters' fraud claims, the FDIC had a defense to claims of fraud of which it lacked knowledge under a rule of federal common law.

The Eleventh Circuit agreed with the trial court's holding. The Gunter court, relying on *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) concluded that federal law governed the Gunters' fraud claims because the controversy implicated the rights and obligations of the FDIC. The Court by way of background noted that the FDIC is a federal corporation which insures bank deposits. As insuror, one of the primary duties of the FDIC is to pay the depositors of a failed bank. Two methods are available to accomplish that. One is to liquidate the assets of the bank and then pay the depositors their insured amounts, covering any shortfall with insurance funds. The other method is for the FDIC to employ a purchase and assumption. That type of transaction involves the FDIC arranging for another bank to purchase the failed bank and reopen it without interrupting banking operations.

The purchase and assumption is clearly a more attractive method. Such operates to continue the banking operations of the failed institution with no loss to depositors and prevents the sight of a closed bank. However, the FDIC usually must determine which of the methods to pursue and consummate the transaction with great speed to preserve the going concern value of the failed bank and avoid an interruption in banking reserves. *Id.* at 865.

The *Gunter* court, after concluding that federal law governed the plaintiffs' fraud claim, analyzed and weighed the factors elucidated in *Kimbell Foods* to decide whether state law should be employed to give content to the federal law or whether a nationally uniform federal rule was appropriated. The *Gunter* court concluded that a uniform federal rule governs the FDIC's exposure to fraud claims and then fashioned a complete defense to such claims for the FDIC when it acquires a note pursuant to a purchase and assumption transaction. That rule is that the FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement.

In *Federal Deposit Insurance Corporation v. Gulf Life Insurance Company, supra,* the Eleventh Circuit extended the protections accorded it by *Gunter* to the defenses of waiver, estoppel, or unjust enrichment.

### III.

The Defendants raise the personal defense of fraudulent inducement to the promissory notes held by Plaintiff FDIC, who took them in the course of the purchase and assumption transaction in issue. The Defendants contend that the notes are vitiated by actual or constructive fraud perpetrated by the First National Bank, through its president, Charles Fraser. The Defendants also contend the notes cannot be enforced because the instruments are not supported by adequate consideration.

Defendants contend that the First National Bank, through its president, Charles Fraser, made certain misrepresentations to EAGLE PROPERTIES, LTD., or its partners, individually or jointly, and knowingly omitted to state to the Defendants certain facts. Defendants allege that Fraser represented that (1) the real property in issue was worth $75 million and that he had an appraisal either completed or in the process of completion that would support such a fair market value, when the building was actually worth less; (2) the transaction would permit the Bank to legally book a profit for the year 1982, when the transaction actually was not properly booked by the Bank in 1982; (3) the transaction would materially improve the Bank's position with the Office of the Comptroller of the Currency, when such representation had no basis; (4) the purchasers could legally take advantage of depreciation deductions on

their individual taxes and have a tax shelter as a result of owning the properties, when there was, in fact, jeopardy to the partners in taking such depreciation; (5) the purchasers would complete the purchase in 1982, when actually there may not have been a completed sale or purchase in 1982; (6) the transaction would help resolve the Bank's financial condition, when the transaction did not help the Bank's plight. The Defendants also alleged that Fraser knowingly omitted to state that (1) no accounting firm had approved the details of the transactions as proposed to the purchasers; (2) the Bank officers and employees had found the value of the properties to be less than $75 million; (3) the purchasers needed a cash investment or note backed up by a letter of credit to effectuate the sale for tax purposes; (4) the Bank directors' guaranties of certain indebtedness could impair the completed transfer of ownership of the properties to the purchasers; (5) the Office of the Comptroller of the Currency approved the transaction; (6) Fraser had misstated to the Bank Board that the OCC had approved the transaction; (7) no committee of the Bank had reviewed or approved the transaction.

The Defendants allege that a fiduciary relationship existed between Fraser and them. They allege that because of that fiduciary relationship, Fraser had a duty to disclose to them all of the facts which he concealed from them.

■ Fraud may be actual or constructive. Generally, actionable fraud involves false representation of past or present material facts or a false promise to do some future act. *Keasler v. Natural Gas Pipeline Co. of America*, 569 F.Supp. 1180 (E.D.Tex.1983), affirmed 741 F.2d 1380 (5th Cr.1984). Legal fraud, on the other hand, is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. *Shwiff v. Priest*, 650 S.W.2d 894 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Capitol Rod & Gun Club v. Lower Colorado River Authority*, 622 S.W.2d 887 (Tex.App.—

Austin 1981, writ ref'd n.r.e.); *Archer v. Griffith*, 390 S.W.2d 735 (Tex.1965). The Court initially will examine Defendants' defense under the first species of fraud.

## A.

■ Defendants allege that they were fraudulently induced into entering into the lease-salesback transaction. To establish fraudulent inducement, the Defendants must have shown the following elements: (1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he thereby suffered injury. *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1120 (5th Cir.1984); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977); *Oilwell Division, United States Steel Corporation v. Fryer*, 493 S.W.2d 487 (Tex.1973). Stated another way, actionable fraud is predicted on the elements of misrepresentation, falsity, deception, scienter, and injury.

The evidence reflects that sometime in the second half of 1982, the management of the First National Bank began exploring the possibility of selling the bank's building complex. Management viewed the idea of selling the bank as a way to enable the bank to offset any losses the bank would have in 1982 from a substantial charge that the Office of the Comptroller of the Currency may require on certain loans and to cover an increase in the bank's loan reserve account that would be required by the OCC. The OCC in July 1983 had placed the First National Bank under its special supervisory attention, and conducted extensive examinations of the books and records of the bank.

The impetus for the sale of the building complex became more pronounced as time moved closer to the end of 1982. At the October 13, 1982 meeting of the bank's board, Charles Fraser reviewed the prelimi-

nary numbers from the bank examination that had been conducted. Fraser indicated at that meeting that the examiners had come up with a large number of classified loans which would require a relatively large charge-off. The board was of the opinion that if such were to occur, the resulting disclosure could be very detrimental to the bank. The board, therefore, as a means to offset and possible losses, directed management to be prepared to sell the bank building. The minutes of the board's meeting reflect the following:

> It was pointed out that one possible action that management was looking into to mitigate the effects of a large charge-off would be to sell and lease back the bank building. A corporation had been put in place to facilitate this type action. A motion was made by Mr. Brooks, seconded by Mr. Cappodonna, directing management to put things in place to be ready to sell the building and arrange financing, so that if this action were necessary we would be ready to go. The motion was unanimously approved by the Board.

In this connection, Mike Magill, then Senior Vice President, Finance and Administration, was instructed around this time to develop a price and structure for a sale and leaseback transaction of the bank complex.

On November 9, 1982, during a special meeting, the Board resolved that management proceed with the sale of the building and complete the transaction by November 30, 1982. The Board at that meeting also directed management to bring to it the final numbers of the sale for Board approval prior to consummating the transaction. The Board also during that meeting discussed the option of restating previously reported losses or waiting and publishing fourth quarter numbers, showing actual charge offs mandated by the OCC along with the sale of the building complex. The Board chose the latter course, deciding that such would cast the bank as being adequately capitalized in order to sustain the large charge off without impairing the bank's financial condition.

At a special meeting held on November 24, 1982, the Board was informed of the preliminary numbers provided by the examiners. Those numbers reflected the amount of $69 million of loans especially mentioned, $260 million classified substandard, $30 million classified as doubtful, and $20 million classified as loss. The Board learned that the bank would be directed to place approximately $160 million of loans on nonaccrual and that the bank would be required to charge-off about $11 million of accrued and unpaid interest on the loans to be placed on nonaccrual. It was pointed out that the volume of classified assets was about 200 percent of gross capital and that the especially mentioned amount was another 50 percent. At that meeting, management informed the Board that a plan had been designed to mitigate the effects of the loan charge-offs. The plan consisted of the bank selling a pool of assets with a current book value of $75 million to a newly-formed corporation. The pool consisted of the bank complex with a book value of $25 million, commercial loans which had been classified as doubtful and loss with a book value of $40 million, and accrued but unpaid interest with a value of $10 million. The plan called for the bank to receive $75 million in cash and a subordinated convertible note for about $15 million as consideration for certain assets. In addition, the bank would enter into a ten-year lease for the building, garage, and land. Lease payments would be about what the bank had been spending for occupancy. The plan also called for the newly-formed corporation to obtain a $75 million loan from one or more banks. The Board was informed that this plan had been reviewed by outside counsel and outside auditors and had received the approval of both.

On December 1, 1982, Fraser reported to the Board that personnel with InterFirst Bank in Dallas had reviewed the proposed transaction and concluded that upwards of $75 million could probably be lent under a conforming real estate loan. InterFirst indicated that it was unwilling to provide all the financing and wanted another bank to participate. Fraser reported that following discussions with officials with Texas Com-

merce Bank in Houston, TCB was willing to participate in the building financing, even wished at that time to be considered as a potential buyer. At the December 1 meeting, it was reported that Main-Hurdman reversed its previous approval of the transaction, concluding that as in its present form the transaction would not be a true sale. The Board directed management to get a second opinion from an outside auditor, and, if that opinion was unfavorable to conclude a sale and leaseback of the building on a stand-alone basis.

On December 8, 1982, the Board was advised that Arthur Anderson had been retained for a second opinion on the accounting of the proposed transaction and confirmed the advice of Main-Hurdman. The Board also learned of modifications in the original transaction plan. The new plan called for the formation of a Subchapter S corporation consisting of seven to ten shareholders who would contribute $150,0000 to $250,000 in cash along with a $2.5 million note. In this connection, the minutes read:

> This Corporation would purchase the building, garage, and land from the Bank for a price of $75,000,000.00. Consideration in this transaction would be an assignment of the $25,0000,000.00 in notes from the corporate shareholders, as well as the issuance of a letter of credit for $50,000,000.00 comprised of $25,000,000.00 each from both InterFirst and TCB. The Subchapter S corporation would arrange an interim loan from these two banks which would be funded on or before December 20, 1982. In conjunction with the interim loan commitment, the corporation would open up an Irrevocable Standby Letter of Credit of $50,000,000.00 in favor of our Bank. It would be the intention of this corporation to seek and obtain permanent financing before December 20, 1983, at which time the Letter of Credit would be taken out and the interim financing would be terminated with the banks. A third party appraisal of the building would be obtained during the first quarter of 1983. If the appraisal reflected a value greater than $75,000,000.00, the price would be adjusted upward; otherwise, the $75,000,000.00 price would stand. The result of this transaction would be that our Bank would book the total purchase price in 1982 of $75,000,000.00 for financial purposes. The Bank may or may not need to enter into a lease of the facilities with the corporation, and in any event would have prior right to first refusal on the lease or sale of the building. The transaction would permit the tax gain to be taken in 1983.

Fraser indicated that approval of the OCC and Federal Reserve would be warranted. He also indicated that it was vital to show earnings for 1982 and that the transaction would permit the Bank to increase loss reserves and still show a profit. The Board approved the sale and leaseback transaction as proposed.

On December 22, 1982, the Board learned of the final examiners' report. The final figures reflected that the bank's condition was poor with a heavy volume of criticized and classified loans. First National Bank had been placed on the OCC's problem bank list. The examiners had found in the loan area that there were many exceptions to sound credit and collateral procedures. A total of 26 percent of the bank's gross loans were found to have exceptions. The examiners had found that a significant number of loans subject to further loss which will adversely affect bank earnings in 1983. The minutes read in part:

> With respect to the Examiners' report, the following figures are considered to be final:

| | $(000) |
|---|---|
| 1. Total Classified Loans | |
| Substandard | 267,612 |
| Doubtful | 31,853 |
| Loss | 31,205 |
| 2. Other Assets Especially Mentioned | 69,933 |

The Examiners found that the bank's decline in asset quality was due to (1) a sharp decline in the petroleum industry in 1982; (2) imprudent loan portfolio management and lending practices conducted during a recent period of rapid growth that led to over-lending to certain customers; (3) lack of an active internal loan review function; and (4) the bank's internal watch list great-

ly understated problems in the portfolio. The Examiners further stated that the bank's future prospects were unfavorable. Liability management of the bank was subject at that time to external factors beyond the bank's control. These factors threatened the bank's ultimate solvency. Moreover, the Examiners noted that disclosure of the losses mandated by the Examiners could result in a loss of confidence by the bank's depositors, further weakening the bank's position. The Examiners, however, reported that the Board and management were rendering at that time proper supervision and have the capability of returning the bank to a sound condition provided external factors do not adversely impact the bank. During their December 22nd meeting, Fraser reported that not much progress had been made on the building sale in the previous four to five days. Fraser indicated that a limited partnership was being considered, rather than a Subchapter S corporation as the purchasing entity.

Charles Fraser elicited the participation of TOM BROWN and M.W. BRANUM in the limited partnership. Fraser asked both to serve as general partners. BROWN had a long relationship with the bank and Fraser. In fact, he had invested in the bank in excess of one million dollars in stock in First National Bank.

Fraser contacted the individuals who would become the Defendants in this cause and engineered this rather involved transaction during the waning weeks of 1982. The original plan was to recruit ten individuals of substantial means and good fortune to participate in a partnership that would purchase the bank complex. Due to time constraints and the fact that Fraser's endeavors came during the Christian holiday period of December, the bank president only gained the agreement of these Defendants. The Defendants are knowledgeable, capable and sophisticated businessmen. Between December 23, 1982, and December 31, 1982, Fraser met with each individual Defendant and managed to elicit his assent to participate in the limited partnership. During each meeting, Fraser represented that the bank had just undergone an unfavorable examination by bank regu-

lators and that the bank was required to make substantial charge-offs. Fraser told each EAGLE partner he was concerned about showing a profit by year end 1982. Fraser indicated to each partner that a sale of the building would permit the bank to book a profit. Fraser's position was that the transaction would help the bank's financial plight. Fraser also stated that the transaction had to be consummated by December 31, 1982. The price tag was $75 million, Fraser told each individual Defendant.

To some of the Defendants, Fraser represented he had an appraisal justifying the price of $75 million. Such representation was not made to Defendants CHARLES PERRY, GENE SLEDGE, and JIMMY DAVIS. To SLEDGE, Fraser indicated that appraisals were forthcoming, but opined that the building complex was worth every bit of the $75 million price and perhaps as much as $100 million. Likewise, Fraser did not represent to Davis a value for the properties, but only related that the price was $75 million.

That leaves Defendants CLINT HURT, CARL LAWRENCE, M.W. BRANUM, and TOM BROWN to whom Fraser represented he had an appraisal supporting the price. Interestingly, none of these men requested to see the appraisal. They, moreover, did not condition their participation in the limited partnership on being able to see and review the appraisal.

Fraser, in addition to the other representations, indicated that the transaction could have favorable tax ramifications. It is, however, unclear what the content of the representation was.

To be actionable, a representation must be that of a material fact. *Trenholm v. Ratcliff, supra.* Pure expressions of opinion are not actionable. *Id.* However, an expression of an opinion may constitute fraud if the speaker has knowledge of its falsity. *Id.* citing *Texas Industrial Trust, Inc. v. Lusk,* 312 S.W.2d 324, 328 (Tex.Civ. App.—San Antonio 1958, writ ref'd); *T.M. Brooks v. Parr,* 507 S.W.2d 818, 820 (Tex. Civ.App.—Amarillo 1974, no writ). An ex-

pression of an opinion as to the happening of a future event may also constitute fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future. *Trenholm v. Ratcliff, supra,* citing *Russell v. Industrial Transportation Co.,* 113 Tex. 441, 251 S.W. 1034, 1037 (Tex.Comm.App.1923, holding app'd), aff'd on rehearing, 113 Tex. 441, 258 S.W. 462 (1924); *Ratcliff v. Trenholm,* 596 S.W.2d 645, 651 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.); *Wright v. Carpenter,* 579 S.W.2d 575, 580 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Moreover, an action for fraud may be maintained when an opinion is based on part or present facts. *Trenholm v. Ratcliff, supra,* citing *Buchanan v. Burnett,* 102 Tex. 492, 119 S.W. 1141, 1142 (1909); *Mutual Life & Loan Ass'n. v. Jackson,* 76 S.W.2d 547, 548 (Tex.Civ.App.—Texarkana 1934, writ dism'd); *Burcum v. Gaston,* 196 S.W.2d 257, 259 (Tex.Civ.App.—Amarillo, 1917, no writ).

■ The Court is of the opinion that these representations are not actionable. The representations that the sale-leaseback transaction would improve the bank's financial condition were expressions of opinion and did not rise to the level of representations of fact. Obviously, Fraser and the bank were attempting to convert a non-earning asset into capital for the bank and hope that an upturn of the petroleum and associated industry would come about. Certainly, Fraser did not have special knowledge of facts that were to occur or exist in the future.

■ The representations that the transaction would be completed for 1982, that the transaction would enable the bank to book a profit, and would have favorable tax consequences for the Defendants were likewise statements of opinion, which have legal implications. Generally, fraud cannot be predicated upon misrepresentation as to matters of law. *Sawyer v. Pierce,* 580 S.W.2d 117 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Page v. Baldon,* 437 S.W.2d 625 (Tex.Civ.App.—Dallas 1969, writ ref'd n.r.e.). This rule is buttressed on the assumption that everyone is presumed to know the law. *Sawyer v. Pierce,* supra. A misrepresentation may be actionable as to matters of law between fiduciaries. *Moreau v. Oppenheim,* 663 F.2d 1300, 1310 (5th Cir.1981), *cert. denied* 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982). Moreover, a misrepresentation of law may be actionable when the representer has superior knowledge or information and uses that unfairly over the representee. *See Meacham v. Halley,* 103 F.2d 967, 971 (5th Cir.1939), cert. denied 308 U.S. 572, 60 S.Ct. 86, 84 L.Ed. 480 (1939). As will be explained later in this opinion, the Court does not find that a fiduciary relationship existed between Fraser and each of the individual Defendants. In addition, the Court does not see that Fraser had a decided advantage over the EAGLE partners. Each had the means and wherewithal to have attorneys and accountants review this transaction. In fact, two of the EAGLE partners were apparently represented by counsel at the closing of this transaction.

■ Finally, there is the representation made by Fraser that he had an appraisal that would justify the price of $75 million. There was no completed appraisal by a qualified appraisal firm on the date of closing in which a fair market value for the bank complex was stated. As such, such representations were false. In addition, the representation would have to be considered material because the purchase agreement set the price of the properties in issue at $75 million as a floor. The price was subject only to an upward adjustment following an appraisal completed subsequent to closing. The difficulty the Court has with this is that none of the four who heard this representation either demanded to see the appraisal or conditioned their participation in the limited partnership on reviewing the appraisal Fraser represented he had obtained. As the Court sees it, the transaction in issue was quite substantial. With all that was involved, our community's ideals of making such a business commitment would expect that individuals of the Defendants' place take the precaution of reviewing an appraisal and being fully

informed as to the value of the properties they were purchasing.

## B.

Defendants seek to vitiate the notes on the grounds that Fraser knowingly omitted to state or reveal certain material facts.

Section 551 of the Restatement Second of Torts (1977) provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him;

and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

A fiduciary relationship generally arises over a long period of time when parties have worked together towards a mutual goal. *O'Shea v. Coronado Transmission Co.*, 656 S.W.2d 557, 563 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). Such relationships arise as a matter of law in the context of attorney-client, trustee-cestuique trust, and partner-and-partner. *Trevino v. Sample*, 565 S.W.2d 93, 96 (Tex. Civ.App.—El Paso 1978, writ ref'd n.r.e.). In addition, such relationships may arise from moral, social, domestic or purely personal relationships. *Id.* The evidence must show, though, that the dealings between the parties have continued for such a period of time that one party is justified in relying on the other to act in his best interest. *O'Shea v. Coronado Transmission Co., supra; Thomson v. Norton*, 604 S.W.2d 473, 476 (Tex.Civ.App.—Dallas 1980, no writ). Subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship. *Id.*

The evidence presented reflects the EAGLE partners were or had been long standing customers of the First National Bank. The partners, or the companies of which they were principal, at the time had substantial sums of money on deposit at the bank, and they maintained a business relationship with the bank. In the case of TOM BROWN or CARL LAWRENCE, a personal relationship existed between Charles Fraser and them. With perhaps one exception, the partners were shareholders in the bank. It was clear that these partners generally had a loyalty to the bank for the reason that the bank had loaned these parties money when they started out in business.

No doubt, a professional relationship and a friendship existed between Charles Fraser and the EAGLE partners. However, the evidence reflected that the interests of the parties in this transaction were not necessarily concomitant. One member of the Board, RICHARD BROOKS, characterized the relationship during his testimony as that of vendor-vendee. In addition, the

evidence did not present that prior to this transaction the business relationship between Charles Fraser and the EAGLE partners was anything more than that of a banker and customer. It is a close call. The Court finds and concludes that a fiduciary relationship did not exist between Charles Fraser and the bank and the EAGLE partners. The Court finds that the factual disclosures and representations made by Fraser were adequate to inform the EAGLE partners of the bank's financial position and the reasons for selling the building complex.

Defendants specifically complain that Fraser did not reveal internal calculations made by the bank's chief financial officer, which reflected a value for the bank complex to be less than $75 million. The Defendants also complain that Fraser failed to disclose the adverse financial condition of the bank in December 1982. The evidence reflects, however, that Fraser represented to each EAGLE partner that an unfavorable report had been received from bank examiners. The impression the Court had from each Defendant's testimony is that each knew the bank had definite financial problems. In addition, TOM BROWN was an advisory member of the bank's Board, and was in attendance at the Board's December 22, 1982, meeting and apparently heard the examiners' report. Comment K to § 551 of the Restatement Second of Torts states:

> When the facts are patent or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he cares to do so, or when the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discerned. To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indo-

lent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies.

Defendants also complain that Fraser did not reveal that the OCC had not approved the transaction and had misstated to the bank's Board that the OCC had approved the transaction. The December 15, 1982 meeting reflects that only Fraser represented that the OCC indicated that the sale would be a positive step for the bank. Clifton A. Poole, the Deputy Comptroller, Southwestern District of the Office of the Comptroller of Currency, noted that he first learned of the sale-leaseback transaction in either November or December 1982 at a meeting held in his office. He noted that the bank was not asking for OCC approval. No one from the OCC objected to the transaction. Poole did not have any particular reaction to the transaction. Poole stated that a representation by Charles Fraser at a board meeting that Poole had thought the sale would be a positive step for the bank was only Fraser's interpretation of the meeting. However, Poole said he probably encouraged Fraser to use whatever means he could to generate capital, provided the transaction was legal.

Defendants also allege that Fraser omitted to state that the EAGLE partners needed a cash investment or a note backed up by a letter of credit in order to effectuate the sale for tax purposes. Defendants also complain that Fraser did not state that the bank guaranties of certain indebtedness of the purchasers could impair the completed transfer of ownership of the properties to the purchasers. These matters the Court feels were within the Defendants' interest to know from their own advisors prior to entering into the transaction. The Defendants complain that Fraser omitted to state that no accounting firm had approved the details of the transaction. The evidence reflects that the accounting firm of Main Hurdman indicated at the closing of the transaction that, if the transaction was concluded as then proposed, with a limited

number of director guaranties, it would be able to formally approve the sale. On January 12, 1983, Main Hurdman issued the written approval that the transaction was a valid sale under generally accepted accounting principles.

Lastly, Defendants allege that Fraser failed to state that no committee of the bank had reviewed, analyzed or approved the transaction. The record shows that the concept of a sales-leaseback had been discussed by the bank. Although the transaction was not approved, the bank's Board did authorize Fraser to execute the transaction.

█ Therefore, in accordance with the foregoing, the Court concludes that neither Charles Fraser nor the First National Bank fraudulently induced the Defendants to enter into this transaction or to execute the promissory notes in issue.

█ The Court, finding that the EAGLE partners were not fraudulently induced into this transaction, does not have to address the issue of actual knowledge. However, if the Court had to, the Court would find that the FDIC did not have actual knowledge of conduct or communications that would give rise to a finding of fraud. The case of *FDIC v. Wood, supra,* is helpful in giving content to the concept of actual knowledge. In *Wood,* the defendant raised the defense of usury to an action on a note brought by the FDIC against a guarantor on the note. The defendant in that case argued that the FDIC must be charged with knowledge that the note was usurious. Under a state statute, a loan made by a bank to an individual at an interest rate of more than seven percent was usurious unless there was a sworn statement specifying the type of business and the business purpose. The defendant argued that the interest rate of 15.21 percent and the lack of a statement in the bank's files should have warned the FDIC of the usury defense. The *Wood* Court held that the FDIC did not have actual knowledge. It stated,

That argument ignores our explicit holding in *Gilman* [660 F.2d 688 (6th Cir. 1981)] that the FDIC is under no duty, in

either of its capacities, to examine the assets of a failed bank before it agrees to execute a purchase and assumption transaction. 660 F.2d at 694. The FDIC cannot, therefore, be charged with knowledge of a defense merely because that information could be found in the bank's files. Furthermore, actual knowledge must be shown as of the date the FDIC entered into the purchase and accumption agreement. *Id.* at 695. *Cf. FDIC v. Merchants National Bank,* 725 F.2d 634, 640 (11th Cir.) [similar holding under 12 U.S.C. § 1823(e)], *cert. denied* [469] U.S. [829], 105 S.Ct. 114, 83 L.Ed.2d 57 (1984).

In this case, the defendant's assertion that the FDIC had knowledge of the defense was based only on the fact that an examination of the bank records should have put the FDIC on notice. That allegation is not sufficient to overcome the presumption that the FDIC had no knowledge of any defenses against it. *Id.* at 162.

The FDIC, it appears, had three sources of information about the First National Bank during the times relevant to this issue. First, the FDIC received information from the OCC. Second, the FDIC began during the early part of 1983 monitoring the bank. Three, the FDIC, beginning in February 1983, started to put together a bid package for a prospective purchase and assumption agreement. Such a process called for the FDIC to review and assemble information from the bank's files. In that connection, it is unquestioned that the FDIC knew of the transaction and, for the most part, of the documents making up the transaction. However, the evidence reflected that the FDIC, through its personnel, did not know of the representations made by Charles Fraser or the First National Bank to persuade the EAGLE partners to enter into this transaction. In addition, the FDIC did not know of the character of the communications or conduct of Charles Fraser or the bank, and the agency did not know what, if any, effect the communications and conduct had upon the EAGLE partners.

The record reflects that the FDIC had suspicions about the sale-leaseback transaction. These suspicions arose from information from a joint OCC–SEC investigation along with information from the FDIC's own personnel. The focus of that suspicion, however, was on the accounting treatment of the transaction and whether the transaction accurately reflected upon the bank's capital. Personnel with the FDIC were also curious about the difference in the purchase price of the building and its appraised value. The Court does not believe though that such warrants a finding of actual knowledge on the part of the FDIC, nor does it warrant a conclusion that the FDIC should have investigated the substance of the transaction. Prior to the date of the purchase and assumption transaction, none of the EAGLE Defendants had complained of fraud. The EAGLE partners even went so far as to agree to the early funding of the letters of credit in June 1983.

### IV.

The Defendants contend that the First National Bank committed violations of federal securities laws in connection with the sale-leaseback transaction. Specifically, they allege that the bank sold the Defendants a security within the meaning of the Securities Exchange Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. The Defendants allege that the purchase of the partnership interests, together with the purchase of the building and the lease and management agreements with the bank, was a transaction wherein the EAGLE partners invested their money in a common enterprise and were led to expect profit solely from the efforts of the bank. The Defendants claim that the purchase of partnership interests constituted investment contracts. The Defendants allege that in soliciting, promoting, and arranging the sale-leaseback transaction and sale of the general and limited partnership interests, Charles Fraser made materially untrue statements of material fact. He allegedly further omitted to state material facts. The Defendants claim that the bank acted in a manner contrary to § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j and Rules 10b–5, 17 C.F.R. § 240.10b–5 (1983).

This claim or defense fails for the reason that the Defendants did not meet their threshold burden of showing the relevant transactions are securities. 15 U.S.C. § 77b (U.S.C.A. Supp.1985) defines the term "security" to mean:

any note, stock treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate of subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security', or any certificate or interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The definition of a security under the 1934 Act corresponds with that in the 1933 Act. However, the later Act has a provision that a security "shall not include currency or any note, draft, bill of exchange, or bank's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. 78c (U.S.C.A. Supp.1985).

In determining whether the transactions in issue are securities, the Court turns to the case of *Williamson v. Tucker*, 645 F.2d 404 (5th Cir.1981), *cert. denied* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). In that case, the Fifth Circuit reiterated the test for defining an investment contract,

which was announced in *Securities & Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). For there to be an investment contract there must be "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *Williamson, supra*, at 417.

There is no question that each Eagle Partner made an investment of money. Was there a common enterprise? In *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974), the Fifth Circuit adopted a vertical commonality approach. That Court held that the critical factor in the common enterprise test "is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." *Id.* at 478. Vertical commonality, then, would require the investor and the promoter to be involved in the same common venture or undertaking. This element is missing as to the partnership interests, for the reason that the bank was not a partner to EAGLE PROPERTIES. The Court also finds that the third element would be missing as to both the partnership transaction and the sale-lease-back. The critical inquiry under the third element is whether the efforts made by those other than the investors are those essential managerial efforts which affect the failure or success of the enterprise. *Williamson, supra*, at 418. The *Williamson* Court stated:

> We must emphasize ... that a reliance on others does not exist merely because the partners have chosen to hire another party to manage their investment. The delegation of rights and duties-standing alone-does not give rise to the sort of dependence on others which underlies the third prong of the [*Securities & Exchange Commission v. W.J.*] *Howey* [*Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) ] test. An investor who retains control over his investment has not purchased an interest in a common venture 'premised on the reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others,' even if he has contracted with the vendor for the management of the property. So long as the investor retains ultimate control, he has the power over the investment and the access to information about it which is necessary to protect against any unwilling dependence on the manager. It is not enough, therefore, that partners in fact rely on others for the management of their investment; a partnership can be an investment contract only when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control. *Id.* at 423–424.

Clearly, the evidence before the Court reflects that EAGLE PROPERTIES participated in the lease of the building and the control of the property. Under the terms of the Management Agreement, the First National Bank was the sole and exclusive manager and rental agent for the bank complex the partnership had purchased. Among other things, the bank was responsible for handling complaints and requests of tenants; for receiving and collecting rents; for keeping records of disbursements incurred in managing and operating the premises; and for renegotiating and modifying leases of bank tenants. However, under the Management Agreement, the bank was required to comply with EAGLE PROPERTIES' accounting instructions. The bank also could not make a commitment for capital improvements or repairs without the prior written consent of EAGLE PROPERTIES. Any work as to alterations, installations, or replacements by the bank manager had to be discussed with EAGLE PROPERTIES and the scope of such had to be agreed upon by the owner and maager. Further, in each proposed budget, the bank manager is required to set forth recommendations for the scope of repairs and improvements to be approved by the owner. Moreover, the management agreement provides in pertinent part:

> 5.1. This Agreement shall be non-cancellable by either Owner or Manager for a period of three (3) years commencing on December 31, 1982 and ending on

December 31, 1985, except that (a) Owner may cancel this Agreement at any time for good cause for unsatisfactory performance by Manager, and (b) Manager may cancel this Agreement at any time if Owner substantially interferes with Manager's performance hereunder so as to prevent or substantially impair Manager with respect to exercising its rights or performing its obligations hereunder or if Owner shall fail or refuse to perform and discharge any or all of its obligations hereunder.

On June 17, 1983, the parties executed an amendment to the Management Agreement. Under that amendment EAGLE PROPERTIES retained the power to cancel the management agreement for the unsatisfactory performance of the bank manager.

Therefore, EAGLE PROEPRTIES, the investor, retained ultimate control over the bank building. As such, the Defendants had not purchased a security.

### V.

■ Defendants also complain that the First National Bank failed to disclose material facts in connection with the early funding of the letter of credit. Such early funding was a part of a rehabilitation plan developed by the bank and presented to bank regulators. Defendants complain that the First National Bank failed to disclose the financial status of the bank, the details of the rehabilitation plan, and investigations conducted by the OCC and the SEC concerning whether the 1982 financial reports of the bank to regulatory agencies and shareholders accurately stated the financial position of the bank.

The Court finds that during the spring of 1983 the general public in the Midland and Odessa area were well aware of the financial health of the First National Bank. As such, little if anything of substance was hidden from the EAGLE partners. In addition, the OCC review and investigation dealt only with accounting and disclosure issues relating to the bank. An issue involved was the propriety of the accounting treatment of the sale and its effect upon the bank's capital. The Court concludes that the bank had no duty to disclose the matters complained of in connection with the early funding of the letters of credit. As such, the Court concludes that the First National Bank did not fraudulently induce EAGLE to agree to the early funding of the letters of credit.

### VI.

Defendants contend that the EAGLE notes are unenforceable at the present time under the operation of two subordination agreements. Defendants alleged that the EAGLE notes were subordinated to the debt underlying the $50,000,000.00 letters of credit. They allege that not all of the conditions required of the subordination agreements have been met.

The evidence reflects that on December 31, 1982, a Certificate and Subordination of Vendor's Lien was executed by Charles Fraser, the President of The First National Bank of Midland. That document provides in part:

4. FNBM agrees that those certain promissory notes (the "Partner Notes") of the Partners in the aggregate amount of Twenty-Five Million and no/100 Dollars ($25,000,000.00), which have been delivered and assigned by Customer FNBM as part of the consideration owing to FNBM pursuant to the contract, together with any other obligations of the Customer to FNBM (the Partner Notes and all amounts owing to FNBM thereunder or under any assignment, pledge, security agreement, mortgage, or other instrument evidencing or securing the Partner Notes, or any of them, are herein collectively called the "Subordinated Debt"), shall, at all times, be, and same hereby are subordinated to the payment and performance by Customer and its Partners of the Obligation. Until the Obligation has been fully paid and performed, FNBM will not receive or accept any payment from Customer or its Partners on the Subordinated Debt, ex-

cept for the regular interest payments, if any, therein required. If FNBM receives any payment of the Subordinated Debt (or any part thereof), other than the regular interest payments therein required, FNBM will hold such payment in trust for the Banks to be applied by the Banks to the Obligation. FNBM will not commence any action or proceeding against Customer or the Partners to recover any part of the Subordinated Debt or to enforce or collect any security therefor unless and until the Obligation shall be fully paid and performed.

Sometime thereafter, a Supplement and Modification Agreement was executed by the First National Bank, Texas Commerce Bank, InterFirst Bank, and EAGLE PROPERTIES. The Agreement was signed by Stuart Williams, Executive Vice President of the First National Bank; Stephen Field, Executive Vice President for Texas Commerce Bank; Denny Alberts, Executive Vice President for InterFirst, and M. W. BRANUM and THOMAS C. BROWN, as General Partners for EAGLE PROPERTIES. In the agreement, the parties modified and supplemented writings previously executed. One such modification was to paragraph 4 of the Certificate and Subordination of Vendor's Lien. Under the Supplement, Paragraph 4 of the Certificate was deleted in its entirety and replaced with the following language:

4. FNBM agrees that all debts, obligations, and liabilities of every kind and character of the Customer, now or hereafter existing in favor of FNBM, including, without limitation, those certain promissory notes (the *"Partner Notes"*) of the Partners in the aggregate amount of Twenty-Five Million and no/100 Dollars ($25,-000,000.00), which have been delivered and assigned by Customer to FNBM as part of the consideration owing to FNBM pursuant to the Contract, together with any other obligations of the Customer, to FNBM (all such debts, obligations, and liabilities, including the partner Notes and all amounts owing to FNBM thereunder or under any assignment, pledge, security agreement, mortgage, or other instrument evidencing or securing such debts, obligations, and liabilities, including the Partner Notes, or any of them, are herein, collectively, called the *"Subordinated Debt")*, shall, at all times, be and same hereby are subordinated to the payment and performance by the customer and its Partners of the Obligation. Until the Obligation has been fully paid and performed, FNBM will not receive or accept any payment from Customer or its Partners on the Partners Notes, except for the regular interest payments, if any, therein required; provided, however, FNBM will not receive or accept any payment on the Partner Notes if a Default occurs. If FNBM receives any payment of the Partner Notes (or any part thereof), other than the regular interest payments therein required (unless a Default occurs), FNBM will hold such payment in trust for the Banks and will forthwith turn over such payment to the Banks, to be applied by the Banks to the to the Obligation. FNBM will not commence any action or proceeding against Customer or the Partners to recover any part of the Subordinated Debt or to enforce or collect any security therefor unless and until the Obligation shall be fully paid and performed. As used herein, the term the *"Remainder of the Subordinated Debt"* means the Subordinated Debt *less* the Partner Notes. Until the Obligation has been fully paid and performed, FNBM will not receive or accept any payment from the Customer of the Remainder of the Subordinated Debt. If FNBM receives any payment from the Customer of the Remainder of the Subordinated Debt (or any part thereof), FNBM will hold such payment in trust for the Banks and will forthwith turn over such payment to the Banks to be applied by the Banks to

the Obligation. The Remainder of the Subordinated Debt shall not be secured by any assets or properties of the Customer. In no event shall FNBM receive or accept any payment from any source on the Subordinated Debt if a Default occurs, and if FNBM so receives any such payment, FNBM will hold such payment in trust for the Banks and will forthwith turn over such payment to the Banks to be applied by the Banks to the Obligation.

The issue arises whether the provisions of these agreements are enforceable against the FDIC under the holding of *D'Oench, Duhme and Co. v. Federal Deposit Insurance Corporation,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and the provisions of 12 U.S.C. § 1823(e).

*D–Oench* stands for the proposition that, as a matter of public policy, a secret agreement cannot be used as a defense to a claim by the FDIC upon a written instrument. In that case, the FDIC brought suit on a demand note executed in 1933 by a Missouri maker payable to the Belleville Bank & Trust, Belleville, Illinois. The FDIC insured the bank in 1934. The bank failed. The FDIC in 1938 acquired the note as part of the collateral securing a loan to the bank, made in connection with the assumption of the bank's deposit liabilities by another bank. The maker's defense was that the note had been given without any consideration whatsoever and with the understanding that no suit would be brought on the note. The maker also contended that the FDIC was not a holder in due course. *Id.* at 456, 62 S.Ct. at 678. The FDIC contended that the maker was estopped to raise such defenses on the grounds that the note was executed for the purpose of permitting the bank to carry the note and to not show certain bonds sold to the bank which later defaulted. The FDIC argued that such would operate to deceive creditors of the bank, state banking authorities, and the FDIC. The FDIC further contended that the maker had participated in the misrepresentation by its actual knowledge of the purpose of the notes and by the payment of interest on the notes to make them appear to be a good asset.

The main point of controversy in the case was what law was applicable. Justice Douglas stated that the maker's liability on the note was a question of federal, rather than state, law, inasmuch as the FDIC was created by an Act of Congress and had brought the suit by authority of an act of Congress. Justice Douglas wrote that pertinent federal statutory provisions "**reveal a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures as to which it makes loans.**" *Id.* at 457, 62 S.Ct. at 679. After analyzing the case law applicable to this federal policy, Justice Douglas set out that the relevant test in that a case was "**whether the note was designed to deceive the creditors or the public authority or would tend to have that effect.**" *Id.* at 460, 62 S.Ct. at 680. He wrote,

It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled. *Id.*

Justice Douglas added as to the maker in that case:

Though petitioner was not a participant in this particular transaction and, so far as appears, was ignorant of it, nevertheless it was responsible for the creation of the false status of the note in the hands of the bank. It, therefore, cannot be heard to assert that the federal policy to protect respondent against such fraudulent practices shoud not bar its defense to the note. *Id.* at 461, 61 S.Ct. at 681.

12 U.S.C. § 1823(e) is a codification of *D'Oench* and acts to further the protections set forth from that opinion. That subsection provides:

No agreement which tends to diminish or defeat the right, title or interest of the corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid

against the corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

The case law subsequent to this statutory enactment is well settled that any alleged agreement whatsoever which diminishes the interest of the FDIC in an asset which it has acquired from a bank pursuant to 12 U.S.C. § 1823(e) is absolutely invalidated as against the corporation, unless each of the statutory requirements is met. *Federal Deposit Insurance Corporation v. de Jesus Velez*, 678 F.2d 371, 375 (1st Cir.1982). *See also Federal Deposit Insurance Corporation v. Hoover-Morris Enterprises*, 642 F.2d 785 (5th Cir. 1981); *FDIC v. First Mortgage Investors*, 485 F.Supp. 445, 451 (E.D.Wis.1980); *FDIC v. Waldron*, 472 F.Supp. 21, 25 (D.S.C. 1979), aff. 630 F.2d 239 (4th Cir. 1980); *Federal Deposit Insurance Corporation v. Smith*, 466 F.Supp. 843, 845 (N.D.La. 1979). This law is based not on a theory of holder in due course status, but on the federal public policy of protecting the institution of banking. *Id., Darco v. American City Bank and Trust*, 429 F.Supp. 767 (D.Nev.1977).

■■■ The Board of Directors did not specifically approve the Certificate and Subordination of Vendor's Lien. The minutes from the December 29, 1982 meeting of the Board reflects:

BE IT FURTHER RESOLVED, that Mr. Fraser be, and he hereby is, authorized and directed to negotiate, execute and deliver, on behalf of the Bank, an agreement for the sale and purchase of real property on terms no less favorable than outlined above and such other and further documents as may be necessary to consummate the sale of the above-described property including, but not limited to, all deeds assignments, rights of first refusal, estoppel certificates, subordination agreements, and such other certificates and instruments as Mr. Fraser may deem necessary or advisable in connection with the proposed sale of said land and improvements with the terms and conditions being contained in each of such instruments being hereby approved and authorized by the Board of Directors; . . .

The action by the Board, however, does not meet the requirement of § 1823(e)(3). In the first place, the Board's action appears, in actuality, to be authorization for the then president of the Bank to execute subordination agreements. The Board's action was two days prior to the execution of the document. The minutes do not reflect action approving specifically the Certificate and Subordination of Vendor's Lien. Accordingly, the Certificate is unenforceable against the FDIC. The Court concedes that this conclusion is seemingly harsh, especially when it can be inferred from the evidence that the Board probably would have approved the Certificate anyway. However, § 1823(e) was designed to effectuate *D'Oench* and protect this country's banking system. Obviously, each requisite listed in § 1823(e) has separate justification supporting this broad purpose. As such, the Court is of the opinion that the better course would be to require that an agreement which tends to diminish or defeat the right, title or interest of the FDIC squarely meet all four of the requirements of § 1823(e). *Accord, de Jesus Velez, supra.* In addition, such agreements must be specifically approved by the board of directors of the subject bank, with that approval being reflected in the minutes of the board or bank loan committee.

The question is then whether the Supplement of Modification meets the requirements of 12 U.S.C. § 1823(e). Page 122 of the Pre-Trial Order reflects that on June 20, 1983, the Board of Directors authorized and directed Stuart Williams, the Executive Vice President of the Bank, to examine and deliver the Supplement and Modification

Agreement dated as of June 17, 1983, among the Banks, EAGLE PROPERTIES, InterFirst, and Texas Commerce Bank. In this case, the Board apparently had before it the document upon which it could pass. 12 U.S.C. § 1823(e) expressly requires as a condition of validity that an agreement be executed contemporaneously with the acquisition of the asset by the bank. One court has held that failure to meet this requirement voids the agreement. *FDIC v. Waldron, supra.* That requirement is missing here. Accordingly, the Court is of the opinion that the subordination agreements are unenforceable against the FDIC.

## VII.

Defendants allege that the FDIC disaffirmance of the lease and management agreement executed by the First National Bank and EAGLE operates as a failure of consideration to the notes or as equitable estoppel to FDIC on collecting the claim asserted under the doctrine of unjust enrichment. Under these defenses, the Defendants seek a declaration that the EAGLE promissory notes are unenforceable; alternatively the Defendants seek either rescission of the entire transaction or damages in recoupment.

In general, failure of consideration occurs when, because of some supervening cause after the agreement is reached, promised performance fails. The evidence presented reflects that on December 31, 1982, the First National Bank and EAGLE executed a lease agreement wherein the bank would lease the main banking house premises, garage, and motor bank then being occupied by the bank at that time. EAGLE and the First National Bank also executed a management agreement under which the bank would manage the entire banking house, parking garage, and motor bank property at a fixed fee. The lease agreement was modified in June 1983 in connection with the early funding of the letters of credit. The modified agreement in significant part operated to increase the rents to be paid EAGLE by the First National Bank.

■ The Court finds that the lease and management agreements are distinct from the purchase agreement. Although executed at the same time, the lease and management agreements were not executed for the same purpose as the purchase agreement. The latter served to transfer to the EAGLE limited partnership the 24-story office building, the garage, and motor facility. The consideration which passed to the First National Bank was, in part, the promissory notes in issue. The lease agreement calls for EAGLE PROPERTIES to provide the First National Bank with space in which and on which to conduct its business. The management agreement provides for the bank to manage the entire facility. Although executed at the same time, the three agreements reflect three different contracts, rather than one.

On October 7, 1983, Joe Selby, the Senior Deputy Comptroller for the OCC, wrote to William Isaac, Chairman of the Board of the FDIC, a letter that stated, in part:

> The First National Bank, Midland, Texas, Charter 4368, is on the verge of insolvency....
>
> .     .     .     .     .
>
> Further administrative action by this Office would serve no useful purpose. It appears that a purchase or payment of insured deposits may become necessary. Accordingly, we are hereby requesting the Federal Deposit Insurance Corporation ("Corporation") to begin evaluating the market for potential purchasers and prepare to receive the bank pursuant to 12 U.S.C. § 191 and § 1821.

On October 13, 1983, a bidders' meeting for the First National Bank was held. At the meeting, FDIC personnel distributed a bidder information sheet and a copy of the Purchase and Assumption Agreement which an acquiring bank would be required to enter with the FDIC. The Agreement provided, in part:

> As to the leased premises constituting the main banking house and related improvements, in the event the receiver is able to obtain marketable title to said leased premises, the assuming bank hereby agrees to purchase said premises, in-

cluding related improvements, at the appraised value determined by a mutually acceptable MAI appraiser ... However, if the receiver is unable to obtain marketable title to the main banking house and related improvements, the assuming bank shall be required to accept an assignment of the present lease relating to such premise, or a sublease or renegotiated lease in the event an assignment cannot be effectuated.

The successful bidder was Republic Bank Corporation, on behalf of a newly chartered bank, Republic Bank First National of Midland. The Purchase and Assumption Agreement signed on October 14, 1983, contained the following revision:

The assuming bank shall have the option to take an assignment or sublease of the lease covering the main bank premises of the bank, which option shall be exercised no later than sixty days after date of bank closing.

Republic Bank First National Midland elected not to take an assignment of the lease within the sixty-day period. On December 12, 1983, the FDIC disavowed the lease.

Usually a bid package is offered on a take-it-or-leave-it basis. Bidders are to bid on the packet as presented unless something surfaces at the meeting that suggests difficulty in transferring an asset. At the bidders' meeting, there were questions raised by prospective bidders concerning the lease on the bank complex. Some of the bidders felt the rentals for the properties were substantially higher than market and would affect significantly the bids. FDIC officials, subsequently, decided to change the bid package and give the prospective bidders an option on assuming the leases. With the insertion of an option, the FDIC revised its minimum bid price. As mentioned, the successful bid was of Republic Bank in the amount of $51.1 million. The second highest bid was that of the Mercantile Texas Corporation in the amount of $18.112 million. Subsequent to October 14, 1983, EAGLE negotiated and executed a lease for rental substantially less than provided in the EAGLE–First National Bank lease.

The Court is of the opinion that the FDIC's disavowal of the lease does not operate as a defense to the FDIC's ability to recover the amounts of the promissory notes in issue. Moreover, remedies in the form of rescission or recoupment cannot be premised on the FDIC's disavowal of the lease. The foregoing is not founded under § 1823(e) or the federal holder in due course status. In *Federal Deposit Insurance Corporation v. Grella*, 553 F.2d 258 (2d Cir.1978), that Court stated,

While it succeeds to the rights of the creditors of the bank as well as the rights of the corporation in connection with the liquidation of the bank assets and is charged with the payment of expenses of administration and enforcement of the obligations of the bank, the receiver is not subject to liability for the provisions of the unexpired term of a lease of the bank premises, and it may take a reasonable time to adopt or reject the same. *First Nat'l Bank of Chicago v. First Nat'l Bank of Wheaton*, 78 F.2d 502 (7th Cir.), *cert. denied*, 296 U.S. 651, 56 S.Ct. 368, 80 L.Ed 463 (1935). *See Buhl Land Co. v. Kavanaugh*, 131 F.Supp. 136, 143 (E.D.Mich.1954), aff'd, 223 F.2d 265 (6th Cir.1955). Further, the refusal of an insolvent national bank and its receiver to take possession under a long-term lease does not entitle the lessor to damages from the bank or its receiver as lessee. *Fidelity Safe Deposit & Trust Co. v. Armstrong*, 35 F. 567 (C.C.S.D.Ohio 1888). Nor does the appointment of a receiver dissolve the insolvent bank, and a suit may be instituted against the bank without joining the receiver for a simple money judgment based upon the bank's obligations. (citation omitted).

*See also Argonaut Savings & Loan Association v. Federal Deposit Insurance Corp.*, 392 F.2d 195, 197 (9th Cir.1968).

### VIII.

Defendants claim the First National Bank acted in a manner in violation of the Bank Holding Company Act, 12 U.S.C. § 1972. Defendants DAVIS and LAW-

RENCE aver that as a result of the bank's proscribed conduct the notes sued upon by the FDIC are null, void, and of no force or effect. The remaining Defendants, as stated in their counterclaim, contend they are entitled to treble damages from the bank in the amount of $75 million. In addition, the Defendants allege they are entitled to such treble damages against the FDIC by way of recoupment to the extent the FDIC seeks to enforce the EAGLE notes.

12 U.S.C. § 1972 provides, in part:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

    (a) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

    (b) that the customer shall obtain some additional credit, property or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

    (c) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

    (d) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or

    (e) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impair a credit transaction to assure the soundness of the credit ...

To recover under this statute, a party asserting the anti-tying claim must prove (1) that the banking practice in question was unusual in the banking industry; (2) an anti-competitive tying arrangement; and (3) that the practice benefits the bank. *Rae v. Union Bank,* 725 F.2d 478, 480 (9th Cir.1984), citing *Parsons Steel, Inc. v. First Alabama Bank of Montgomery,* 679 F.2d 242, 246 (11th Cir.1982). Thus, this statute is not intended to interfere with the conduct of appropriate traditional banking practices but was intended to prohibit anti-competitive practices which require bank customers to accept or to provide some other service or product, or refrain from dealing with other parties in order to obtain the bank product or service they desire. *Id. Swerdloff v. Miami National Bank,* 584 F.2d 54 (5th Cir.1978); *Clark v. United Bank of Denver National Ass'n.,* 480 F.2d 235 (10th Cir.1973), *cert. denied* 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973).

The evidence reflects that TOM BROWN met with members of the bank's executive committee to discuss the early funding of the letters of credit. At the end of the meeting BROWN indicated that he would need to obtain the approval of the EAGLE partners to an early funding of the letters of credit. John Hendrix of the Executive Committee reminded BROWN that the EAGLE partners owed money to the bank. The Defendants' version is that the comment sounded like a threat to BROWN. According to Hendrix, he was attempting to inject levity into the situation. The Defendants contend that the comment had the effect of tying the early funding of the letters of credit to the EAGLE Defendants' continued relationship with the bank.

The Defendants' anti-tying claim fails. Arguably, if the bank had premised the Defendants' early funding on the provision of future services, then the bank would have violated the statute. However, with the evidence presented, the Defendants failed to show an anticompetitive tying arrangement.[5]

## CONCLUSION

In accordance with the foregoing, each individual Defendant is liable to the FDIC for the amount of the note or notes he executed to EAGLE PROPERTIES, LTD.,

---

**5.** In addition, as far as the tying arrangement being based upon an unwritten agreement as understanding, 12 U.S.C. § 1823(e) renders this claim unenforceable against the FDIC.

plus interest thereon through December 31, 1984, and interest thereafter until the date of Judgment. In addition, Defendants TOM BROWN, M. W. BRANUM, and EAGLE PROPERTIES, LTD. are jointly and severally liable to the FDIC for the amount of $25 million plus interest through December 31, 1984, and interest thereafter until the date of Judgment. The Court will enter a Judgment in accordance with this Opinion. The Court directs the FDIC to submit to the Court within five (5) days from the date of filing of this Opinion what evidence and authority it has on the claim for attorneys' fees. After considering such, the Court will enter a Supplemental Judgment on attorneys' fees.

IT IS SO ORDERED.

## JUDGMENT

In accordance with the Court's findings and fact and conclusions of law heretofore entered in the Court's Opinion,

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation have and recover from the Defendant Thomas C. Brown the sum of SIX MILLION, TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($6,250,-000.00) as principal and the sum of ONE MILLION, SEVEN HUNDRED AND FIVE THOUSAND, FOUR HUNDRED AND SEVENTY–NINE and 78/100 DOLLARS ($1,705,479.78) as accrued interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation have and recover from the Defendant M.W. Branum the sum of SIX MILLION, TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($6,250,-000.00) as principal and the sum of ONE MILLION, SEVEN HUNDRED AND FIVE THOUSAND, FOUR HUNDRED AND SEVENTY–NINE AND 78/100 DOLLARS ($1,705,479.78) as accured interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insur-

ance Corporation have and recover from the Defendant Gene Sledge the sum of TWO MILLION, FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) as principal and the sum of SIX HUNDRED AND EIGHTY–TWO THOUSAND, ONE HUNDRED AND NINETY–ONE and 38/100 DOLLARS ($682,191.38) as accrued interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation have and recover from the Defendant J.L. Davis the sum of TWO MILLION, FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) as principal and the sum of SIX HUNDRED AND EIGHTY–TWO THOUSAND, ONE HUNDRED AND NINETY–ONE and 38/100 DOLLARS ($682,191.38) as accrued interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation have and recover from the Defendant Charles Perry the sum of TWO MILLION, FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) as principal and the sum of SIX HUNDRED AND EIGHTY–TWO THOUSAND, ONE HUNDRED AND NINETY–ONE and 38/100 DOLLARS ($682,191.38) as accrued interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation have and recover from the Defendant Clint Hurt the sum of TWO MILLION, FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) as principal and the sum of SIX HUNDRED AND EIGHTY–TWO THOUSAND, ONE HUNDRED AND NINETY–ONE and 38/100 DOLLARS ($682,191.38) as accrued interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation have and recover from

the Defendant Carl Lawrence the sum of TWO MILLION, FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) as principal and the sum of SIX HUNDRED and EIGHTY–TWO THOUSAND, ONE HUNDRED AND NINETY–ONE and 38/100 ($682,191.38) as accrued interest thereon, together with interest at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that Defendants Thomas C. Brown, M.W. Branum, and Eagle Properties, Ltd. be and hereby are jointly and severally liable to the Federal Deposit Insurance Corporation for the amount of TWENTY–FIVE MILLION DOLLARS ($25,000,000.00) plus accrued interest, together with interest thereon at the legal rate of 7.91 percent until the date judgment is paid.

IT IS ORDERED, ADJUDGED, AND DECREED that the Federal Deposit Insurance Corporation be and hereby is entitled to foreclosure on its Second Deed of Trust on the Property.

IT IS ORDERED, ADJUDGED, AND DECREED that the costs of court be and hereby are assessed against the Defendants.

For all of which, let execution issue.