**TEXAS COMMERCE BANK, N.A., Trustee, Plaintiff,**

v.

**UNITED SAVINGS ASSOCIATION OF TEXAS, et al., Defendants.**

Civ. A. No. H–91–210.

United States District Court, S.D.Texas, Houston Division.

April 29, 1992.

Robert G. Bailey, Bailey, Crowder & O'Neil, Houston, Tex., for FDIC and United Sav. Ass'n of Texas FSB.

Michael P. Cash, Liddell, Sapp, Zivley, Hill & LaBoon, Houston, Tex., for Texas Commerce Bank, Nat. Ass'n Trustee.

Paul D. Clote, Franci N. Beck, Susman & Godfrey, Martha N. Jacob, Lance C. Winchester, Ryan & Winchester, Kent W. Robinson, McFall & Sartwelle, Houston, Tex., for defendants-counter-claimants.

## OPINION ON INTERPLEADER

HUGHES, District Judge.

### 1. *Introduction.*

In March 1988, United Savings Association set up deferred compensation for its top managers, called the executive bonus plan. United created an express trust at Texas Commerce Bank to implement the plan. Texas Commerce Bank is the trustee, and the top two tiers of managers at United are the beneficiaries. Texas Commerce interpleaded the corpus of the trust for the court to determine whether the Federal Deposit Insurance Corporation or the beneficiaries had the right to the funds. With the exception of the seven managers who released their interest in the trust funds, the beneficiaries will recover their vested interests in the trust.

### 2. *Background.*

United Savings Association of Texas was a state-chartered savings association. Like many others in the 1980s, it failed. On December 30, 1988, the Federal Home Loan Bank Board declared United insolvent. By

a series of resolutions, it terminated all employment contracts and liquidated substantially all of United's assets by sale.

As United continued to accumulate loan losses, its prospects dimmed. To keep the key employees from leaving, United adopted a plan that promised a specific group of United managers additional compensation if they remained with United until January 1, 1989. United established the plan and trust in March 1988. The amounts held for each employee reflected differences in job responsibility and experience, and they ranged from $1,500 to $50,000 (16% to 34% of base salary) for the mid-level managers and from $50,000 to $156,000 (29% to 40% of base salary) for the senior managers. Before April 30, 1988, United paid each employee 25% of the promised additional compensation. Texas Commerce held the remaining 75% in trust until it deposited the funds with the court in late 1991.

Under paragraph four of the plan, as long as United did not fire the employee and the employee did not quit, the employee was entitled to the money. United did not fire any of the beneficiaries, nor did any of the beneficiaries quit before January 1, 1989. They all worked through December 30, 1988, the last working day of the year. The plan also stated that if United was dissolved or liquidated, or if it sold substantially all of its assets, the employees would receive their money on the day of dissolution or, if the employee became an employee of the successor company, on January 3, 1989.

The FDIC, as receiver for United, now claims that the beneficiaries fraudulently diverted the money from the financially troubled United to Texas Commerce in anticipation of United's insolvency. The beneficiaries contend that the plan and trust were valid inducements to have key workers remain with United during troubled times and that they earned the money.

### 3. *Standard for Summary Judgment.*

There are no issues of material fact. *Herbert Abstract Co., Inc. v. Touchstone Properties, Ltd.*, 914 F.2d 74 (5th Cir.1990).

Based on the pleadings, the twenty-eight beneficiaries will recover their interest as a matter of law. The seven senior managers, as a matter of law, released their right to the trust funds.

### 4. *Function of the Plan and Trust.*

The purpose of the trust, as spelled out in the plan, was to induce United managers to stay with the troubled company. The amounts were not exorbitant and were to be awarded only for work that the employees actually performed. The money was conditioned on their working at United until January 1, 1989.

These "bonuses" were, more accurately, a form of deferred compensation. They were not severance pay. An employee who receives severance pay is actually being compensated for not working. These bonuses also were not golden parachutes (current slang for high-level, expensive severance packages). Parenthetically, in some instances extraordinarily expensive severance packages for numerous executives are used as a technique to limit the attractiveness of the company to an independent successor. Unlike receiving severance pay or a golden parachute, the United employees actually worked for the compensation now held in trust. This plan is similar to retaining part of an expatriate worker's pay on the condition that the full term abroad be worked. Each of the beneficiaries accepted United's offer to defer for nine months their reward for riding out the rapid downward spiral of United.

### 5. *FDIC's Attacks.*

The FDIC contends that the plan and trust are invalid because (a) the funds were fraudulently transferred, (b) their creation was unsafe and unsound, and (c) there was never board approval. The FDIC has failed to articulate a plausible factual basis for these bald assertions. The beneficiaries presented ample evidence to squelch these gratuitous quibbles.

### A. *Fraudulent Transfer.*

To support a claim of fraudulent transfer, the FDIC must show that the officers

created the trust with the intent to defraud United creditors and that the trust rendered United insolvent. Tex.Bus. & Com. Code Ann. § 24.001 (1991). United was not insolvent when it created the trust, and there is no evidence to support the allegation that the trust rendered United insolvent.

United did not conceal the transfer; members of the FHLB were present at the board meeting when the managers discussed and ratified the plan and trust. Upon United's full disclosure, the FHLB did not object. United did not attempt to hide the money at Texas Commerce. United regularly used Texas Commerce as a trustee. It was United's legitimate business decision to encourage experienced employees to stay with the company. United was not in the position to recruit and train new managers in what became its last few months of existence. There was no fraudulent transfer of funds.

### B. *Unsafe or Unsound.*

The federal regulations prohibit insured institutions from entering into an employment contract that is an "unsafe or unsound" practice. 12 C.F.R. § 563.39(a) (1988). The FDIC asserts, without any factual basis, that the plan rewarded officers for mismanaging the institution into insolvency. The plan rewarded the beneficiaries for standing watch as the ship slowly sank; it did not reward them for running the ship onto the rocks. As a legitimate business decision, the trust and plan were not "unsafe or unsound" for purposes of the federal regulation. Mere allegations, however insulting, will not create issues of fact.

### C. *Board Approval.*

The FDIC also asserts that, even if lawful, the plan and trust never became effective because they were not ratified by the board of directors. Again, the FDIC provides no factual basis for this claim and ignores the evidence in the record. The evidence clearly demonstrates that, not only were they discussed and ratified, but the discussions took place in front of FHLB

members. On March 30, 1988, the United compensation committee approved the plan. The board of directors ratified the committee's actions in May of 1988. Both the plan and trust were effective.

Not only is there no factual basis for this claim, but the alleged *D'Oench Duhme* doctrine is not relevant here. Only if the beneficiaries were trying to enforce the trust against USAT, FSB, or the FDIC would *D'Oench Duhme* apply. Neither the trust nor the plan is an agreement that tends to diminish the right, title, or interest of the FDIC in any asset it acquired. *D'Oench Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The trust corpus is not an asset of the FDIC. Texas Commerce, as trustee, holds legal title to the funds.

Even if *D'Oench Duhme* did apply, its requirements of a writing, execution, approval, and continuous official record are satisfied because the minutes reflect multiple specific references to the plan and trust. *FDIC v. Eagle Properties, Ltd.*, 664 F.Supp. 1027, 1051 (W.D.Tex.1985). On the facts and the law, the FDIC is wrong.

### 6. *Applicable Law.*

To interpret the trust and plan, either federal regulations or Texas law applies. The federal regulations govern employment contracts of savings and loan associations and allow the FSLIC to terminate contracts for future employment after a savings and loan collapses. The other option is to apply Texas trust law. Because the result is the same under either, the debate is academic.

### 7. *Interpretation.*

### A. *Federal Regulations.*

The federal regulations apply specifically to future employment contracts. 12 C.F.R. § 563. Under these regulations, the FSLIC has the ability to treat every employee as an at-will employee. It may fire or retain any employee at its option. The purpose of this regulation was to provide the FSLIC with greater flexibility to reject excessive term and excessive benefit con-

tracts for employment. 47 Fed.Reg. 17471 (1982). The trust and plan are not the abusive contracts contemplated by the regulation; these are not long-term service or high pay commitments that would force a successor entity to buy out former employees. Rather, the trust, created in advance, was a reserve to award the beneficiaries only for the work they performed in 1988. If the trust and plan were disguised severance pay contracts, then the regulations would apply and terminate the long-term, abusive obligations. *Rush v. FDIC,* 747 F.Supp. 575 (N.D.Cal.1990).

The beneficiaries' claims do not stem from contractual employment rights. *See* trust article XV. The twenty-eight beneficiaries were at-will employees. The seven senior managers, however, did have employment contracts with United. Because they have an employment contract with United, however, does not necessarily dictate that all other relationships they have with United must also be characterized as employment contracts. For purposes of the trust and the plan, the seven senior managers had the same relationship with United as the twenty-eight mid-level managers. The federal regulations allow the FSLIC to abort employment contracts, not all contracts that benefit employees. While the FSLIC could terminate their employment contracts, it did not have the authority to erase all obligations to the seven senior managers.

Even if the federal regulations do apply to trust relationships, there is an exception for rights that have already vested. 12 C.F.R. § 563.39(b)(5). The regulation allows the FSLIC to terminate only future employment contracts. It does not allow the FSLIC to rob an employee of a benefit already earned. For example, if one of the employees had his appendix removed in October of 1988 and did not file his claim until March 1989, he still would be entitled to his health insurance coverage for October 1988 even though he may not be employed by United in 1989. By working during October 1988, the right to health insurance vested for that month.

All of the beneficiaries worked through December 30, 1988, the day the FSLIC put United into receivership. For every day they worked, a little bit more of their interest in the trust vested. If the seven senior managers had not released their interest in the trust funds, they too would have recovered their benefits as a vested right.

### B. *Texas Trust Law.*

 The beneficiaries also prevail under Texas trust law. By the terms of the trust, Texas Commerce was the trustee, United was the settlor, and the employees were the beneficiaries. United, or later the FDIC as the receiver, held a reversionary interest. Under Texas trust law, Texas Commerce held legal title to the funds. The beneficiaries held a vested interest subject to a defeasance. *Rust v. Rust,* 147 Tex. 181, 211 S.W.2d 262, 266 (Civ.App.— Austin), *aff'd,* 147 Tex. 181, 214 S.W.2d 462 (1948).

If any of the employees had quit or been fired for cause before January 1, 1989, the defeasance would have occurred and the employee would have forfeited the interest in the trust. United did not fire any of these beneficiaries, nor did any quit. On December 30, 1988, the FSLIC took over, and United ceased to exist. The FDIC now argues that because the beneficiaries were not employed by United on December 31, 1988, they did not meet the condition of working for United throughout 1988 and consequently forfeited their entire interest in the funds.

The purpose of the trust was to induce the managers to stay with United through 1988 or until United died. The trust could not anticipate the actions of the FHLB, FSLIC, or FDIC. The trust was directed only at the employees and how long they would continue to work voluntarily for United. The only reason the beneficiaries did not work for United on December 31, 1988, was because the FSLIC shut it down. December 30, 1988, was a Friday, the last business day of the year.

The trust provided for a change in ownership. Paragraph seven of the plan says that if there is a change in ownership and

the beneficiary is still an employee of United the day the transaction occurs, the employee is entitled to receive his interest immediately. Change in ownership affects only the timing of the award. Again, the purpose of the plan was to compensate the employees for sticking with United. The employees had no control over whether the dissolution was voluntary or involuntary. The only control they had was whether to quit. Induced by the reserve held in trust, they chose not to quit.

United paid each employee 25% of the deferred compensation for the work performed during the first quarter of the year. The remaining 75% held in trust was for work to be performed during the last three quarters (274 days) of 1988. With every day the beneficiaries worked after the beginning of the second quarter, their vested interest in the trust increased. Even though they were not employed by United on December 31, 1988, they still had already earned 273 days' worth of the trust fund. Under the terms of the trust, they should have been paid 273/274ths of the reserve for the work performed. An employee is entitled to a pro rata amount of a promised extra compensation when the employment is terminated without cause. *Coleman v. Graybar Electric Co.*, 195 F.2d 374 (5th Cir.1952); *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773 (Tex.1974); *Enstar Corp. v. Bass*, 737 S.W.2d 890 (Tex. App.—El Paso 1987, no writ.)

### 8. The Release.

The FDIC asserts that the seven senior managers released their interests in the trust on November 7, 1988. The senior managers contend that they signed the release under duress. They further argue that, even if there was no duress, the release authorized Texas Commerce only to remove their money from the trust account and return it to United. They intended that United would pay them their bonus at the end of the year; they did not intend to release their claims against United or its successors, only against Texas Commerce.

### A. Duress.

What constitutes duress is a matter of law. *Sanders v. Republic*, 389 S.W.2d 551 (Tex.Civ.App.—Tyler 1965, no writ); *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 109 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). Even taking all the allegations as true, there still are no facts, as a matter of law, to support a finding of duress. The seven senior managers freely signed the releases for the benefit of United, its shareholders, and the taxpayers.

The managers state that the FHLB threatened that if they did not sign the releases, United would not become a part of the Southwest Plan, a giant rescue and reorganization for multiple failing savings and loans. The senior managers had a pre-existing fiduciary duty to protect United's future. They admit in a supplemental brief that "as the federal government knew, after all, Mr. Berner and the others owed a fiduciary duty to the company and shareholders requiring that they put USAT's and shareholder interest before their own. Failure to honor this fiduciary duty could have resulted in substantial liability for each individual member of management." Because the FDIC did not put United in its failed condition, it did not force the senior managers to release their interest. *Orkin Exterminating Co. v. Gulf Coast Rice Mills*, 362 S.W.2d 159 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.), *cert. denied*, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 *appeal dism'd*, 375 U.S. 57, 84 S.Ct. 175, 11 L.Ed.2d 122 (1963). The senior managers signed the releases to ensure that United became a part of the Southwest Plan.

The senior managers further contend that the FHLB threatened that, unless they signed the releases, they would never work in the savings and loan industry again. Assuming this threat was made, it is not duress as a matter of law. The senior managers made the best deal they could for United by releasing their bonuses. Tough, even nasty, negotiating is not duress. The managers had an opportunity to enforce the trust or to ingratiate themselves with the FDIC and the other Southwest Plan participants. The managers

knowingly and wisely negotiated a deal in which United would become part of the Southwest Plan so that they and United would have some hope of a future. When circumstances present a person with a series of alternatives, all of which are bad, the choice of the least bad is not duress.

As a matter of law, the seven managers signed the releases on their own free will.

### B. *Effect of the Release.*

■ The document the seven managers signed on November 7, 1988, released their interest in the *trust* funds; it did not release their interest in the contract rights that the funds secured. The release terminated the trust, but it did not rescind the obligations of United under the plan. It authorized United to instruct Texas Commerce to pay their share of deferred compensation held in trust to United.

If the seven senior managers still have rights to their deferred compensation, they must seek payment from the estate of United. They have no interest in the funds interpleaded. In effect, the release passed title to the funds from Texas Commerce to United.

### 9. *Conclusion.*

Because their rights to the trust funds had partially vested, the twenty-eight beneficiaries will recover 273/274ths of their deferred compensation as the pro rata share for the work they actually performed. The seven senior managers released their interests in the fund, without duress, and have no present interest in the trust funds; this portion shall be returned to the estate of United. Texas Commerce properly filed this interpleader action.